AFRICAN AMERICAN VOTING RIGHTS LEGAL DEFENSE FUND, INC.; Charles Q. Troupe; Angela D. Walton, Plaintiffs,

Freeman Bosley, Jr.; Bertha Mitchell, Appellants,

Ida Ford; Charles Parker; Albert Banks; Carol Page; Luretta Hawkins; Elmer Otey; Jacqueline McGill, Plaintiffs,

Sharon Tyus, Appellant,

Laura Gordon; Alexis Johnson, Plaintiffs,

Irving Clay; Claude Taylor, Appellants,

v.

Thomas A. VILLA, in his capacity as President, Board of Aldermen, City of St. Louis, Missouri; Vincent C. Schoemehl, in his capacity as Mayor, City of St. Louis, Missouri; Board of Aldermen, City of St. Louis, Missouri; City of St. Louis, Appellees.

American Civil Liberties Union; United States of America, Amicus Curiae.

No. 92–3826.

United States Court of Appeals, Eighth Circuit.

Submitted April 12, 1995.

Decided May 12, 1995.

material fact as to whether the 1991 reapportionment plan violates § 2, we affirm.[2]

## I. BACKGROUND

The city of St. Louis is governed by a Board of Aldermen consisting of twenty-eight aldermen elected from twenty-eight single member wards. Article I, section 3 of the St. Louis City Charter requires the St. Louis Board of Aldermen to redraw the boundaries of the aldermanic wards in accordance with federal decennial census figures. App. at 70.

These census figures reveal the changing composition of the city of St. Louis and the effects of this change upon the composition of the aldermanic wards. According to the 1970 census, used for the 1971 districting scheme, the St. Louis population looked like this:

|  | % of Total Population | % of Voting Age Population | % of Aldermen Under 1971 Plan[3] |
|---|---|---|---|
| Black | 40.9 | 35.0 | 35.7 |
| White | 58.7 | 64.5 | 64.3 |
| Other | 0.5 | 0.5 | 0.0 |

App. at 33–34, 60, 64–67. This population changed over the ensuing ten years, and by 1980 the census figures which were the basis for the 1981 reapportionment painted a different picture:

|  | % of Total Population | % of Voting Age Population | % of Aldermen Under 1981 Plan |
|---|---|---|---|
| Black | 45.6 | 40.3 | 39.3 |
| White | 53.5 | 58.9 | 60.7 |
| Other | 0.9 | 0.9 | 0.0 |

App. at 32–33, 58, 64–67. The present dispute arose when the Board attempted to follow the mandate to reapportion aldermanic wards in 1991. According to the 1990 census figures, the population of the city of St. Louis breaks down as follows:

Judson Minor, Chicago, IL, argued, for appellant.

Julian Bush, St. Louis, MO, argued (Tyrone A. Taborn, Edward Hanlon and Michael A. Garvin, on the brief), for appellee.

Before BOWMAN, Circuit Judge, HENLEY, Senior Circuit Judge, and MAGILL, Circuit Judge.

MAGILL, Circuit Judge.

This case is before us for a second time as a result of a remand by the Supreme Court. Freeman Bosley, Jr., and four other individual plaintiffs (collectively, "the Bosley plaintiffs") appealed the district court's[1] grant of summary judgment to the City of St. Louis and various officials (collectively, "the St. Louis defendants") in this Voting Rights Act § 2 challenge to a 1991 reapportionment plan. Because we find that the materials submitted to the district court fail to demonstrate the existence of a genuine issue of

1. The Honorable Jean C. Hamilton, United States District Judge for the Eastern District of Missouri.

2. We assume without deciding that all the Bosley plaintiffs have standing to challenge the reapportionment scheme. Because we find no violation of § 2, we express no view on the St. Louis defendants' challenge to the constitutionality of that section.

3. Where the record contains figures for the number of black aldermen, we use these figures, as they denote the actual level of representation. Where such figures are not contained in the record, we use "safe wards" which denote the potential level of representation. In light of the uncontested presence of the three *Gingles* factors, discussed *infra*, these two measures should be virtually identical as each safe black ward will elect a black alderman as its candidate of choice.

| | % of Total Population | % of Voting Age Population | % of Safe Wards Under 1991 Plan 4 |
|---|---|---|---|
| Black | 47.5 | 42.7 | 42.9 |
| White | 50.9 | 55.8 | 57.1 |
| Other | 1.6 | 1.5 | 0.0 |

App. at 32, 45, 56.

The population of St. Louis is remarkably segregated. Over 90% of the white population is concentrated in the south and northeastern portions of the city, while the black population is concentrated in the northern and northwestern portions of the city. With the exception of a "corridor" through the central portion of the city, and another corridor along the Mississippi River in the northeast part of the city, at least 75% of the population of almost every St. Louis neighborhood is a single race. Because of the combined effects of geography and segregation, the 1991 aldermanic wards may be drawn to create anywhere from eleven to seventeen safe black wards.

At the time the 1991 redistricting process began, the Board of Aldermen consisted of seventeen white incumbents and eleven black incumbents. After rejecting a plan proposed by Ward 3 Alderman Freeman Bosley, the Board approved a plan which provided for twelve safe black wards. App. at 31-32.

The Bosley plaintiffs, dissatisfied with a failure to obtain fourteen safe black wards, filed a complaint seeking declaratory and injunctive relief, alleging that the St. Louis defendants manipulated ward boundaries by "packing"[5] and "cracking"[6] black voters for the purpose and with the effect of minimizing the electoral potential of black voters in St. Louis, in violation of § 2 of the Voting Rights Act and the First, Thirteenth, Fourteenth and Fifteenth Amendments. In February, the St. Louis defendants moved for summary judgment on the grounds that the plan's maximum deviation from the ideal ward[7] was + 3.98% and − 4.32%, for a total range of 8.27% and a standard deviation of 2.83%. App. at 50. The St. Louis defendants maintained that the wards had been drawn in such a way as to provide substantial proportionality[8] for black voters, and that the districting plans had resulted in such proportionality since 1971.

Four affidavits were attached to the St. Louis defendants' motion. Fred Steffen, Clerk of the Board of Aldermen of the City of St. Louis, provided information concerning the identity and race of aldermen who repre-

---

4. We define a "safe ward" as one in which a black majority has a practical opportunity to elect the candidate of its choice. A simple majority is not always sufficient to provide this opportunity:

We note ... that a guideline of 65% of total population (or its equivalent) has achieved general acceptance in redistricting jurisprudence.

A guideline of 65% of total population has been adopted and maintained for years by the Department of Justice and by reapportionment experts and has been specifically approved by the Supreme Court in circumstances comparable to those before us as representing the proportion of minority population reasonably required to ensure minorities a fair opportunity to elect a candidate of their choice. This figure is derived by augmenting a simple majority with an additional 5% for young population, 5% for low voter registration and 5% for low voter turn-out, for a total increment of 15%. This leads to a total target figure of 65% of total population. Obviously if voting age population statistics are used, 5% would drop out of the formula, leaving something in the vicinity of 60% of voting age population as the target percentage.
Ketchum v. Byrne, 740 F.2d 1398, 1415 (7th Cir.1983), cert. denied, 471 U.S. 1135, 105 S.Ct. 2673, 86 L.Ed.2d 692 (1985). Thus, we conclude that either 60% of the voting age population or

65% of the total population is reasonably sufficient to provide black voters with an effective majority.

5. Packing is dilution of minority voters' strength by concentrating it "into districts where they constitute an excessive majority." Voinovich v. Quilter, ─ U.S. ─, ─, 113 S.Ct. 1149, 1155, 122 L.Ed.2d 500 (1993) (quoting Thornburg v. Gingles, 478 U.S. 30, 46 n. 11, 106 S.Ct. 2752, 2764 n. 11, 92 L.Ed.2d 25 (1986)).

6. Cracking, fracturing or fragmenting is dilution of the strength of minority voters by "[d]ividing the minority group among various districts so that it is a majority in none[.]" Voinovich, ─ U.S. at ─, 113 S.Ct. at 1155 (quoting Gingles, 478 U.S. at 46 n. 11, 106 S.Ct. at 2764 n. 11).

7. The population of an "ideal ward" is calculated by dividing the total population of St. Louis (396,685) by the number of aldermanic wards (28). This computation yields an ideal ward populated by 14,167.3 persons. App. at 46.

8. Proportionality "links the number of majority-minority voting districts to minority members' share of the relevant population." Johnson v. De Grandy, ─ U.S. ─, ─ n. 11, 114 S.Ct. 2647, 2658 n. 11, 129 L.Ed.2d 775 (1994).

sented each ward for 1971–1992. App. at 63–67. Pelham J. Robinson, Registrar of the City of St. Louis, provided relevant sections of the St. Louis City Charter and a copy of Ordinance 62476, which established the ward boundaries under the 1991 reapportionment plan. App. at 68–83. Stephen Umsheid stated that in a few cases ward boundaries were drawn "through" census blocks, and he explained the method used in such cases. These three affidavits provided the legal and factual background for the statistical analysis contained in the affidavit of Donald L. Davison, the defendants' expert. Davison conducted extensive statistical analyses of the population of St. Louis. Davison analyzed the total population, the voting age population and the Board of Aldermen in terms of racial composition and compared the percentages of each population to the number of aldermen and safe wards. These comparisons led Davison to conclude that the percentage of safe black wards (or black aldermen) was substantially proportional to the percentage of blacks in the voting age population.

The Bosley plaintiffs opposed the motion by filing an affidavit from their own expert, Dr. Charlene Jones. Jones did not take issue with Davison's analysis of proportionality *if* voting age population is used as the relevant population. Rather, Jones took issue with Davison's choice to use voting age population rather than total population in his analysis of proportionality. Jones stated that blacks have historically been underrepresented in terms of total population, and therefore no proportionality existed. Jones noted the continued effects of past discrimination, a factor under *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), and stated that black voting power had not been maximized. Jones also objected to the Umsheid affidavit, claiming that Umsheid used a flawed methodology and improperly adjusted census figures. Jones further objected to the drawing of ward boundaries so that census blocks were split among two wards.

On May 28, the Bosley plaintiffs moved for leave to file a memorandum and additional affidavits in opposition to the St. Louis defendants' motion for summary judgment. The district court denied the motion for leave to file additional materials and granted the defendants' motion for summary judgment on all plaintiffs' claims. The Bosley plaintiffs filed a Rule 59(e) motion to alter or amend the judgment that again sought to introduce additional factual materials. This motion was denied and the plaintiffs appealed the dismissal of their Voting Rights Act claims, arguing that the district court (1) abused its discretion in denying the motion for leave to file a memorandum in opposition; and (2) erred in granting summary judgment on the Voting Rights Act § 2 claims. On August 4, 1993, we affirmed the district court's summary judgment pursuant to 8th Circuit Rule 47B. *African Am. Voting Rights Legal Defense Fund v. Villa,* 999 F.2d 1301 (8th Cir. 1993) (*AAVR*). We denied a petition for rehearing en banc over a dissent by Judge McMillian. *Id.* at 1302.

On June 30, 1994, the Supreme Court decided *Johnson v. De Grandy,* —— U.S. ——, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994). On the same day, the Supreme Court granted certiorari in *AAVR,* vacated the panel opinion, and remanded the case for further consideration in light of *Johnson. Tyus v. Bosley,* —— U.S. ——, 114 S.Ct. 2776, 129 L.Ed.2d 888 (1994). We have carefully considered the Supreme Court's decision in *Johnson* and have concluded that the district court's grant of summary judgment was consistent with the principles enunciated in *Johnson.* Accordingly, we affirm.

## II. DISCUSSION

The Bosley plaintiffs argue that the district court erred in three respects when it granted summary judgment to the St. Louis defendants. The plaintiffs use *Johnson* to raise three specific challenges to the district court's analysis of proportionality. First, the Bosley plaintiffs argue that the district court improperly used voting age population rather than total population to define the "relevant population" for assessing proportionality. Second, they claim that the district court erred by including the entire city of St. Louis, rather than only the allegedly challenged areas, when determining the number

of majority-minority wards to be considered in measuring proportionality. Finally, they argue that the district court gave excessive weight to the proportionality factor by treating it as a per se bar to a § 2 voting dilution claim. However, before we can address the merits of the Bosley plaintiffs' Voting Rights Act claims, we must decide whether the materials that were untimely filed should have been considered by the district court when determining whether a genuine issue of material fact existed.

### A. Did the district court abuse its discretion in refusing to consider the May 28 materials?

The St. Louis defendants filed their motion for summary judgment on February 19, 1992. Local Rule 7(B)(2) provides:

> A party opposing a motion for summary judgment under Fed.R.Civ.Pro. 56 shall serve and file any written brief or memorandum of law and any appropriate extra-pleading materials within twenty days after being served with the motion [for summary judgment].

The Bosley plaintiffs moved for an extension of time to respond and filed the Jones affidavit on April 27, the last day of the extension. More than thirty days later after the extension, and more than ninety days after the original twenty days provided in the local rule, the Bosley plaintiffs sought leave to file a memorandum and affidavits in opposition.

The district court has discretion whether to accept or reject such untimely filed materials. *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 894–98, 110 S.Ct. 3177, 3191–94, 111 L.Ed.2d 695 (1990). A district court's refusal to accept untimely filed materials will not be reversed for abuse of discretion unless the proponent of the materials has made an affirmative showing of excusable neglect. *Id.*

The Bosley plaintiffs submitted a five-paragraph pro se motion to file a memorandum in opposition to the defendants' motion for summary judgment. Citing the importance of the issue, the plaintiffs requested permission to file the memorandum. Although the motion noted the original counsel's failure to file a memorandum or additional affidavits, it was devoid of any reason for this failure to act. Indeed, only by viewing the motion very charitably may any explanation be found. The closest thing to an explanation contained in the motion is the opening paragraph, which states that:

> [d]ue to fundamental differences with counsel, we [the Bosley plaintiffs] dismissed our attorneys and advised them of our decision to withdraw from this case so that we could join as plaintiffs in another voting rights case challenging the same St. Louis Ward map brought by another attorney whose strategies we agree with.

App. at 105. This does not explain why the untimely filed materials were not filed on or before April 27; it only explains the reason for the plaintiffs' decision to file the materials on May 28 after dismissing the original attorney. However, assuming that the same strategic disagreements existed during the period leading up to the filing of the Jones affidavit, the district court decision is not an abuse of discretion. The explanation given by the Bosley plaintiffs is an explicit reference to disagreements concerning strategy, and tactical decisions do not amount to affirmative showings of excusable neglect under Rule 6(b).[9] *See Slaughter v. Southern Talc Co.,* 919 F.2d 304, 307 (5th Cir.1990) (tactical reasons do not amount to excusable neglect). We believe that the district court did not abuse its discretion when it refused to accept these materials which were submitted in violation of the local rule. *Lujan,* 497 U.S. at 894–98, 110 S.Ct. at 3191–94 (no abuse of discretion where district court refused affidavits submitted in violation of briefing order and Fed.R.Civ.P. 6(d) and 56(c)); *see, e.g., Orsi v. Kirkwood,* 999 F.2d 86, 91–92 (4th Cir.1993) (no abuse of discretion where district court refused untimely filed affidavits); *Slaughter,* 919 F.2d at 307 (no abuse of discretion where district court refused affidavits submitted in violation of Fed.R.Civ.P. 6(d) and 56(c)); *Western Chance No. 2 v. KFC Corp.,* 957 F.2d 1538, 1544 (9th Cir.1992) (no

---

9. Although this analysis concerns the May 28 motion, we find that the district court decision concerning the June 29 Rule 59(e) motion was not an abuse of discretion for similar reasons.

abuse of discretion where district court refused affidavit submitted in violation of local rule); *Useden v. Acker*, 947 F.2d 1563, 1571 (11th Cir.1991), *cert. denied*, —— U.S. ——, 113 S.Ct. 2927, 124 L.Ed.2d 678 (1993) (same). Thus, the district court did not abuse its discretion when it considered the record as consisting of the Jones affidavit and the materials accompanying the St. Louis defendants' motion for summary judgment. Accordingly, we consider the question whether the Jones affidavit ᜐand the defendants' materials create a genuine issue of material fact as to whether the 1991 reapportionment plan violated § 2.

**B. Did the district court err in granting the St. Louis defendants summary judgment on the basis of sustained proportionality?**

Summary judgment is appropriate when there is no disputed issue of material fact and the moving party is entitled to judgment as a matter of law. *Egan v. Wells Fargo Alarm Servs.*, 23 F.3d 1444, 1446 (8th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 319, 130 L.Ed.2d 280 (1994); Fed.R.Civ.P. 56(c). We review a grant of summary judgment de novo, applying the same standard as the district court. *Egan*, 23 F.3d at 1446. Material facts are determined with reference to the substantive law governing the claim.

Section 2 of the Voting Rights Act of 1965, *codified as amended*, 42 U.S.C. § 1973, provides:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title [concerning language minorities], as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion of the population.

42 U.S.C. § 1973.

In *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), the Supreme Court imposed structure upon this totality of the circumstances approach by looking to the Act's legislative history and enunciating a series of factors to be considered. These factors, known as the *Gingles* factors, include: (1) whether the minority group "is sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) whether the minority group is "politically cohesive"; and (3) whether "the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances ...—usually to defeat the minority's preferred candidate." *Id.* at 50–51, 106 S.Ct. at 2766–67.

Although *Gingles* involved a challenge to a multi-member districting scheme, *Voinovich v. Quilter*, —— U.S. ——, —— – ——, 113 S.Ct. 1149, 1157–58, 122 L.Ed.2d 500 (1993), and *Growe v. Emison*, —— U.S. ——, —— – ——, 113 S.Ct. 1075, 1083–84, 122 L.Ed.2d 388 (1993), make it clear that the *Gingles* factors are preconditions to a challenge of a single member districting scheme. *Johnson* reaffirms that the *Gingles* factors are preconditions in a vote dilution challenge to a single member districting scheme. *Johnson,* —— U.S. at ——, ——, 114 S.Ct. at 2655, 2657.

In *Johnson,* the Supreme Court held that substantial proportionality barred a § 2 voting dilution claim where there was a history of discrimination and a two percentage point difference between the percentage of Hispanics in the voting age population (47%) and the percentage of Hispanic-majority districts

(45%). The Supreme Court also held that "[w]hile such proportionality is not dispositive in a challenge to single member districting, it is a relevant fact in the totality of circumstances." *Id.* at ——, 114 S.Ct. at 2651.

Neither party makes any claim that any of the three *Gingles* preconditions is not satisfied. Rather, as in *Johnson,* the dispute centers around whether proportionality has been established and, if so, whether proportionality defeats the Bosley plaintiffs' § 2 claim despite the satisfaction of the *Gingles* factors and the *White* factor of continuing effects of past discrimination. *See id.* at ——, ——, 114 S.Ct. at 2655, 2658. The Bosley plaintiffs' claimed errors may be grouped into two categories. The first two arguments challenge the district court's conclusion that proportionality existed. The third argument challenges the district court's treatment of proportionality, assuming that proportionality exists. We address each claimed error in turn.

**1. Is there substantial proportionality?**

**a. Is the total population or the voting age population the relevant population for assessing proportionality?**

■ The parties are in agreement on the material facts. They applied the same criteria for determining whether blacks constituted an effective voting majority in a ward. App. at 87 (Jones affidavit); 32 (Davison affidavit). They agree that it is possible to draw boundaries so as to create fourteen wards with effective black majorities. App. at 89 (Jones affidavit); 22, 23 (defendants' Answer). The Jones affidavit did not take issue with Davison's analysis of proportionality *if* voting age population is used. Rather, Jones argued that Davison's analysis of proportionality was defective because Davison used voting age population rather than total population. App. at 90.

The Jones affidavit fails to create a genuine issue of material fact as to the existence of proportionality because Jones' premise that total population must be used as the basis for proportionality analysis is incorrect under *Johnson.* Jones states that blacks have historically been underrepresented in terms of total population. App. at 90–91. The Davison affidavit does not dispute this, and we assume arguendo that blacks have been underrepresented in terms of total population. However, *Johnson* instructs us to look to voting age population to perform proportionality analysis. Accordingly, we reject the Bosley plaintiffs' claim that the district court erroneously focused on the voting age population rather than the total population when assessing proportionality.

In the first paragraph of *Johnson,* the Supreme Court framed its holding as:

> We hold that no violation of section 2 can be found here, where, in spite of continuing discrimination and racial bloc voting, minority voters form effective voting majorities in a number of districts roughly **proportional to the minority voters' respective shares in the voting age population.**

—— U.S. at ——, 114 S.Ct. at 2651 (emphasis added). *Johnson* consistently defines the relevant population as the voting age population. *See, e.g., id.* at ——, —— & n. 11, —— n. 18, ——, 114 S.Ct. at 2654, 2658 & n. 11, 2662 n. 18, 2663. Although footnote 11 of *Johnson* refuses to resolve the issue of what is the relevant population in a vote dilution claim, the repeated references to voting age population, coupled with the ultimate holding of *Johnson,* at least permit, even if they do not require, use of the voting age population as a relevant population. *Johnson* clearly stands for the proposition that voting age population is *a* relevant population for proportionality purposes despite *Johnson*'s refusal to hold that it is *the only* relevant population. Subsequent cases have unanimously interpreted *Johnson* as approving the use of voting age population as a relevant population. *See, e.g., NAACP v. Austin,* 857 F.Supp. 560, 569 (E.D.Mich.1994) ("In assessing proportionality we use voting-age population figures, as the Supreme Court did in *De Grandy.*"); *see also Shaw v. Hunt,* 861 F.Supp. 408, 440 n. 28 (E.D.N.C.), *petition for cert. filed,* 63 U.S.L.W. 3439 (U.S. Nov. 21, 1994) (No. 94–923); *Vera v. Richards,* 861 F.Supp. 1304, 1339 n. 49 (S.D.Tex.) (three-judge district court), *appeal filed,* 63

U.S.L.W. 3388 (U.S. Oct. 31, 1994) (No. 94–805). Accordingly, we hold that the district court's use of voting age population was consistent with *Johnson* and was not error.[10]

■ We hold that under the 1991 plan, proportionality exists between the percentage of blacks in the voting age population (42.7%) and the percentage of safe black wards (42.9%, or 12 out of 28 wards).[11] This proportionality has existed since 1971: Under the 1971 plan, the black voting age population was 35.0% of the total voting age population, and 35.7% (or 10 out of the 28 wards) were represented by black aldermen. App. at 33–34. Black representation *exceeded* black population by 0.7%. Under the 1981 plan, the black voting age population was 40.3% of the total voting age population and percentage of black aldermen was 39.3% (or 11 out of the 28). App. at 32–33. This difference is half of the 2.0% difference approved in *Johnson*. *Johnson*, —— U.S. at ——, 114 S.Ct. at 2658 (no denial of equal opportunity where Hispanics were effective voting majority in 45% of districts and constituted 47% of the voting age population). We believe the 1991 plan provides continued proportionality, and that the twenty-year history of proportionality (1971–1991) is of sufficient duration to be considered as "sustained."[12] Accordingly, we hold that the district court

acted in a manner consistent with *Johnson* when it examined voting age population to conclude that the St. Louis defendants demonstrated sustained proportionality.

**b. Does the proper geographic scope consist of the entire city of St. Louis or the five central corridors?**

■ We also believe that the district court's focus upon the entire city of St. Louis rather than upon the five central corridor wards was consistent with *Johnson*. The Bosley plaintiffs argue that *Johnson* requires a focus solely upon the contested areas, which they equate with the five wards. We agree that *Johnson* stands for the proposition that the proper geographic scope for the comparison is the scope that is pleaded in the complaint and subjected to proof. However, we disagree with the Bosley plaintiffs' revised characterization of their challenge.

In *Johnson*, which was a consolidation of three actions, "the plaintiffs ... passed up the opportunity to frame their dilution claim in statewide terms." *Johnson*, —— U.S. at ——, 114 S.Ct. at 2662. The complaints filed by two sets of plaintiffs "pointed to areas around the state" of Florida where the alleged violations occurred. *Id.* at ——, 114 S.Ct. at 2652. The Department of Justice

10. We note that the cases cited by the Bosley plaintiffs as support for their argument that total population is the only relevant population are "proportional representation" cases. *Johnson* carefully distinguishes proportionality from proportional representation, the two concepts that the Bosley plaintiffs now attempt to merge. *See Johnson*, —— U.S. at —— n. 11, 114 S.Ct. at 2658 n. 11.

11. The United States as amicus curiae and the Bosley plaintiffs contend that there is a genuine issue of material fact as to whether majority-minority districts numbered eleven or twelve. We reject this argument. The complaint refers to "only 12 65% majority black wards." App. at 15. The Davison and Jones affidavits also indicate that the ward at issue (Ward 2) was a safe black ward. In fact, plaintiffs' expert Jones states that blacks were packed into Ward 2. App. at 86, 88. This evidence completely fails to create a genuine dispute.

Our analysis would not change were we to consider the materials belatedly submitted concerning Ward 2. These materials indicate that black voters have a majority of 59.4% of the

voting age population in Ward 2. However, black voters have a majority of 65.4% of the total population of Ward 2, thereby satisfying the criteria for effective participation. Moreover, we note that the 60% figure is merely a guideline, not an absolute threshold, and we believe that the 0.6% difference is not significant. *Ketchum*, 740 F.2d at 1418. Thus, even if a genuine dispute exists, it does not concern a material fact. We decline the Bosley plaintiffs' invitation to speculate about the meaning of the results of an election in a pre–1991 ward where blacks had only a 58.4% majority, where the election was characterized by low black voter turnout, and where there has been no showing that the defeated candidate was the minority-preferred candidate.

12. Due to the schedule of elections, there is a delay between the adoption of a redistricting plan and the first election under that plan. For example, the first election under the 1971 plan occurred in 1973. The first election under the 1991 plan would not have occurred until 1993. Thus, the terms of the aldermen elected under the 1971–1991 plans actually spanned from 1973–1993.

(DOJ) filed a third action that "alleged that [the apportionment plan] diluted the voting strength of blacks and Hispanics in two parts of the State in violation of § 2." [13]  *Id.* "[N]either the evidence at trial nor the opinion of the District Court addressed white bloc voting and political cohesion of minorities statewide." *Id.* at ——, 114 S.Ct. at 2662. In spite of the fact that the complaints and evidence focused solely upon two counties, the United States sought to expand the geographic scope beyond these counties to include the entire State of Florida. *Id. Johnson* rejected this attempt, confining the geographical scope of its proportionality analysis to the two counties originally challenged in the complaints and subjected to proof at the five-day bench trial. *Id. Johnson* concluded its discussion of this issue by noting that the parties "apparently agreed in the District Court on the appropriate geographical scope for analyzing the alleged § 2 violation and devising its remedy." *Id.*

We believe that the Bosley plaintiffs have fixed upon a citywide geographical scope for analyzing the alleged § 2 violation just as the parties agreed on a two-county-wide scope in *Johnson.* The Bosley plaintiffs' complaint focuses upon a citywide distribution of voting strength. It alleges a § 2 violation due to the 1991 redistricting plan's failure to provide at least fourteen black majority wards out of a citywide twenty-eight. Compl. ¶¶ 45 & 49. Moreover, the complaint refers to the aldermanic wards in a generic fashion that includes all twenty-eight; it does not limit the described wards to the five central corridors. Nowhere in the complaint is any allegation made concerning corridor-specific vot-

ing practices; all such allegations are made on a citywide basis. The Bosley plaintiffs' complaint obviously focuses upon the entire city of St. Louis and they have "passed up the opportunity to frame their dilution claim" in more restrictive terms.

In addition, the only proof submitted by the Bosley plaintiffs, the Jones affidavit, discusses citywide voting patterns. Jones states that:

[t]he plan for reapportionment of the twenty-eight wards for election of members to the Board of Aldermen of St. Louis City, Missouri, enacted in December, 1991, diluted the voting strength of black residents in St. Louis City by packing part of the black population into twelve wards ... w[h]ere they constitute an overwhelming black majority in eleven of said wards in excess of 75% and then by cracking the remaining black population among [seven] wards ... in which they constituted a voting age minority of the population....

App. at 86. Jones also states her conclusions as "[t]he 1991 plan for reapportionment of the twenty-eight wards for election of members of the St. Louis City Board of Aldermen and political party committee members has a discriminatory effect," and that "[i]f the present geographical ward boundaries for electing aldermen and political party committee members, were reapportioned fairly and without discriminatory effect, blacks would constitute effective voting majorities in fourteen out of the twenty-eight wards of said city." [14]  App. at 87. Accordingly, we conclude that the Bosley plaintiffs' pleadings and

---

**13.** The dilution of the votes of the Hispanic population was alleged by the DOJ to have occurred in an area largely covered by Dade County. The dilution of the black vote was alleged to have occurred in and around Escambia County. The appeal to the Supreme Court involved only the claims concerning the Dade County area. *Johnson,* —— U.S. at ——, 114 S.Ct. at 2652.

**14.** The Bosley plaintiffs and Jones repeatedly invoke terms such as "packing" and "fragmenting," as if mere repetition of these terms establishes a § 2 violation. *Johnson* counsels otherwise:

Attaching the labels "packing" and "fragmenting" to these phenomena [*i.e.,* that district

lines separate portions of Hispanic neighborhoods while another district line draws several Hispanic neighborhoods into a single district], without more, does not make the result vote dilution when the minority group enjoys substantial proportionality. —— U.S. at ——, 114 S.Ct. at 2659. The "something more" alluded to by the Court in *Johnson* requires that application of these terms must be supported by statistical (or other appropriate) evidence, and we have found no such evidence here. Thus, the references to packing and fragmenting "say only that lines could have been drawn elsewhere, nothing more.... [S]ome dividing by district lines and combining within them is virtually inevitable and befalls any population group of substantial size." *Id.*

proof before the district court focused upon a citywide area, not merely the five central corridors. We are not persuaded by the plaintiffs' belated attempts to recharacterize their claims on appeal. Thus, because *Johnson* defined geographical scope by the scope that was pleaded and the subject of proof, and the Bosley plaintiffs' pleadings and proof concerned the entire city of St. Louis, we hold that the district court's use of the entire city of St. Louis was consistent with *Johnson* and was proper.[15] Accordingly, we hold that the district court correctly determined that proportionality exists under the 1971–1991 plans.

**2. Did the district court improperly apply proportionality as an absolute bar to a § 2 dilution claim?**

■■■■ The *Gingles* factors are not exhaustive. They are necessary, but not sufficient, to establish a § 2 voting dilution violation. *Johnson*, — U.S. at —, 114 S.Ct. at 2657. In *Johnson*, the Supreme Court considered the existence of proportionality to be sufficient to provide minority voters an equal opportunity to participate in the political process. *Id.* at —, 114 S.Ct. at 2651. However, proportionality is only one factor in the totality of circumstances. It is not a "safe harbor" that automatically defeats a claim of vote dilution:

> While … proportionality is not dispositive in a challenge to single-member districting, it is a relevant fact in the totality of circumstances to be analyzed when determining whether members of a minority group have 'less opportunity than other members

of the electorate to participate in the political process and to elect representatives of their choice.'

*Id.* (citation omitted); *see id.* at —, 114 S.Ct. at 2659. The ultimate question is whether the result of manipulation of district lines "interacting with social and historical conditions impairs the ability of a protected class to elect its candidate of choice on an equal basis with other voters." *Id.* at —, 114 S.Ct. at 2655 (internal citation, quotation and modification omitted).

■■ In its June 17, 1992 order, the district court stated that "[d]efendants contend that as a matter of law Plaintiffs cannot establish their Voting Rights Act claim because evidence of persistent proportional representation establishes that there is no violation of Section 2." Order at 7. The district court then quoted a passage from *Gingles* that stated that "persistent proportional representation is inconsistent" with a § 2 violation. The district court cited *Harvell v. Ladd*, 759 F.Supp. 525 (E.D.Ark.1991), *rev'd on other grounds*, 958 F.2d 226 (8th Cir.1992) (subsequent history omitted), as a case in which sustained electoral success was "the overriding factor." We believe that these quotations and citations indicate a view of the role of the proportionality factor that is consistent with *Johnson*.

■■■ Although, under a strained reading, the district court opinion could be construed as applying a per se rule that proportionality bars a § 2 voting dilution claim, we do not believe that this interpretation is correct.[16] Rather, we believe the district court

---

15. We are aware that *Johnson* was decided after a trial and involved an attempt by the United States to modify the geographical scope on appeal. However, to the extent that this case differs from *Johnson* because it is resolved on summary judgment and/or because the Bosley plaintiffs attempted to change the scope in the district court, *Johnson* expressly declines to impose any requirement concerning the appropriate geographical scope. *Johnson*, — U.S. at —, 114 S.Ct. at 2662. Assuming arguendo that *Johnson* differs from this case in some significant respect (and we believe that it does not), *Johnson* reserved the issue of the appropriate geographical scope, and we find the analysis applied in *Johnson* to be equally applicable here.

16. The district court opinion in *Harvell*, although reversed on appeal because it failed to make

findings concerning whether the sustained electoral success of black candidates was due to "special circumstances," 958 F.2d at 230, listed several factors cited in *Gingles* and carefully considered the totality of circumstances before concluding that sustained electoral success was an overriding factor inconsistent with a § 2 violation. 759 F.Supp. at 528–29. The district court *Harvell* opinion is diametrically opposed to the use of proportionality as a per se rule, and is wholly consistent with *Johnson*.

The district court also cited *Collins v. City of Norfolk*, 679 F.Supp. 557, 563 (E.D.Va.1988), *rev'd on other grounds*, 883 F.2d 1232 (4th Cir. 1989), *cert. denied*, 498 U.S. 938, 111 S.Ct. 340, 112 L.Ed.2d 305 (1990). Although the district court's choice of language was unfortunate, the district court neither adopted nor expressly re-

properly considered the proportionality factor as one of several factors. Although the district court's opinion focuses heavily upon proportionality, it addresses the various other factors and points raised by the Jones affidavit. *See, e.g.,* App. at 133–34 (discussing Jones' challenge to Davison's methodology, to the Umsheid affidavit, and to the practice of block splitting).[17]

However, we need not resolve this issue of interpretation, for assuming that the district court focused its opinion too heavily upon proportionality, we "review judgments, not opinions, and we may affirm a judgment on any ground supported by the record, whether or not that ground was urged below or passed on by the district court." *United States v. Sager,* 743 F.2d 1261, 1263 n. 4 (8th Cir.1984), *cert. denied,* 469 U.S. 1217, 105 S.Ct. 1196, 84 L.Ed.2d 341 (1985); *accord United States v. Dugan,* 912 F.2d 942, 944 (8th Cir.1990); *Johnson,* —— U.S. at —— n. 5, 114 S.Ct. at 2653 n. 5 (discussing review of district court judgment by Supreme Court). We believe that a proper consideration of the proportionality factor as it relates to the totality of circumstances in this case leads inexorably to the conclusion that the complaints contained in the Jones affidavit fail to create a genuine issue of material fact as to whether a § 2 violation has occurred. Jones objected to the drawing

of ward boundaries so that census blocks were split among two wards. However, there is no requirement that federal decennial census blocks be used as boundaries during reapportionment. *See Burns v. Richardson,* 384 U.S. 73, 91, 86 S.Ct. 1286, 1296, 16 L.Ed.2d 376 (1966). Jones states that black voting power was not maximized. App. at 88, 89. However, black voting power need not be maximized. *Johnson,* —— U.S. at ——, 114 S.Ct. at 2656. The Jones affidavit recited the *Gingles* factors and the *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), factor of the continuing effects of past discrimination. App. at 85–86. However, the proportionality factor was given extremely heavy weight in *Johnson* despite evidence of continuing discrimination and satisfaction of the *Gingles* and *White* factors. *See Johnson,* —— U.S. at ——, 114 S.Ct. at 2663. None of the contents of the Jones affidavit create any dispute that would distinguish this case from *Johnson.*

It is significant that none of the scenarios that led the *Johnson* Court to reject a per se rule are present in this case. *See id.* at ——–——, 114 S.Ct. at 2660–61. The only allegation of differential treatment of whites and blacks is Jones' statement that safe black wards contained smaller populations than other wards. To the extent that this is true, it is an enhancement rather than

---

lied upon the paraphrased portion of *Collins.* Rather, the district court merely reported the *Collins* dictum. Moreover, despite the ill-advised dicta, the *Collins* court did not apply proportionality as a per se bar to a § 2 claim. The *Collins* opinion considered numerous circumstances and stressed the totality of circumstances. 679 F.Supp. at 586–87. For these reasons, we do not believe that the district court's citation of *Collins* reveals an improper view of the role of proportionality.

17. The Bosley plaintiffs complain that the district court failed to make sufficiently detailed findings of fact, citing *Harvell v. Ladd,* 958 F.2d 226 (8th Cir.1992). However, the lesson of *Harvell* is not that the trial court must exhaustively catalogue the minutiae of a Voting Rights Act case and deal with factors that are not placed in issue; rather, it is simply that:

> In order to review a district court's findings of fact and conclusions of law, a court of appeals must have before it sufficient detail to enable it to determine the factual and legal bases for the district court's judgment.

958 F.2d at 229. We believe that the district court adequately performed its duty to make its reasoning apparent in this case. While we admonish district courts to take care and include all circumstances that go into the "totality" when these circumstances are placed in issue, we cannot say that the district court failed to do so here. The heavy focus upon proportionality is neither inconsistent with *Johnson* nor surprising, as the record before the district court also dealt almost entirely with the proportionality issue. The record before the district court consisted of the Davison and Jones affidavits and supporting exhibits. The Davison affidavit discusses proportionality extensively and virtually exclusively. In addition to her objections already discussed, Jones objected to the Umsheid affidavit, claiming that Umsheid used a flawed methodology and improperly adjusted census figures. App. at 91–92. However, as the district court noted, Jones based this analysis upon extensive references to deposition testimony not provided to the district court. App. at 91–92.

a dilution of the black vote. Moreover, contrary to the assertions of the plaintiffs, the twenty-eight wards were drawn remarkably evenhandedly. They had an average deviation of 2.8% and a range of 8.3%, neither of which is significant. *See Brown v. Thomson,* 462 U.S. 835, 842, 103 S.Ct. 2690, 2696, 77 L.Ed.2d 214 (1983) (reapportionment plans with deviations of less than 10% require no justification in Fourteenth Amendment context). We believe that this case is virtually indistinguishable from *Johnson,* and that a proper consideration of the proportionality factor would yield the same result as that reached by the district court. Accordingly, we hold that the district court did not act in a manner inconsistent with *Johnson* when it awarded summary judgment to the defendants on the basis of the record before it.[18]

### III. CONCLUSION

We hold that the district court did not abuse its discretion when it rejected the Bosley plaintiffs' untimely filed materials. We also hold that the district court · properly granted summary judgment where the record before it demonstrated that sustained and substantial proportionality existed between the percentage of blacks in the city-wide voting age population and the number of safe black wards. Accordingly, the judgment of the district court is affirmed.

---

**18.** The foregoing analysis has addressed the Bosley plaintiffs' § 2 "effects" claim. We reject the Bosley plaintiffs' argument that a § 2 "intent" claim does not require proof of a discriminatory effect. *Garza v. County of Los Angeles,* 918 F.2d 763, 771 (9th Cir.1990), *cert. denied,* 498 U.S. 1028, 111 S.Ct. 681, 112 L.Ed.2d 673 (1991), relied upon the text of the Voting Rights Act to find that a discriminatory effect was required in an intent case. Although *Garza* was a pre-*Johnson* case, there is nothing in the most recent pronouncements of the Supreme Court to cast any doubt upon its continued validity. The remarks contained in *Johnson* are intended merely to rebut the use of proportionality as a safe harbor. In fact, *Voinovich* is a ringing endorsement of the requirement of a discriminatory effect:

> [Section] 2 focuses exclusively on the consequences of apportionment. Only if the appor-

tionment scheme has the *effect* of denying a protected class the equal opportunity to elect the candidate of its choice does it violate § 2; where such an effect has not been demonstrated, § 2 simply does not speak to the matter. —— U.S. at ——, 113 S.Ct. at 1156 (emphasis in original). In light of statements such as these, it is hardly any wonder that the Seventh Circuit noted that it is "no longer clear that intent plays any role in a suit under section 2." *Barnett v. Daley,* 32 F.3d 1196, 1202 (7th Cir.1994). We agree with the *Garza* court; to the extent that intent plays any role in a § 2 suit, it does so only in conjunction with a discriminatory effect. Accordingly, where there is no discriminatory effect, there is no intent violation. Thus, we affirm summary judgment on the § 2 intent claim as well.