**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 3, 2009

Charles R. Fulbruge III
Clerk

No. 08-11106

VALENTINE REYES; IRENE GONZALEZ; GARY F GARCIA,

Plaintiffs - Appellants

v.

THE CITY OF FARMERS BRANCH TEXAS,

Defendant - Appellee

Appeal from the United States District Court
for the Northern District of Texas

Before HIGGINBOTHAM and STEWART, Circuit Judges, and *ENGELHARDT, District Judge.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

In this voting rights case, we treat a claim that the city of Farmers Branch, Texas has diluted the strength of its Hispanic vote.[1] After a bench trial, the district court rejected the claim. There are two issues on appeal – one legal and one factual. First, the Plaintiffs urge that the Supreme Court's decision in

---

* District Judge of the Eastern District of Louisiana, sitting by designation.

[1] Plaintiffs are three Hispanic citizens of Farmers Branch.

*Bartlett v. Strickland*[2] implicitly overruled Fifth Circuit precedent requiring a minority *citizen* voting-age population in a district proposed under § 2 of the Voting Rights Act to exceed 50% of its total *citizen* voting-age population. Second, the Plaintiffs alternatively urge that the district court clearly erred in finding that Plaintiffs had not proved that the Hispanic citizen voting-age population in their proposed district constituted a majority. Unpersuaded, we reject both arguments and affirm.

I.

Farmers Branch uses a numbered at-large system to elect its five-member city council. Candidates run for a particular numbered position. All voters can vote for all five slots. There is no requirement that a voter be a resident of a particular district. The Plaintiffs maintain that this process dilutes the voting rights of Hispanic residents in violation of § 2 of the Voting Rights Act (VRA).[3]

Only the first of the *Gingles* requirements is at issue in this appeal: "First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district."[4] The Supreme Court has never explained what exactly constitutes a majority, but the Fifth Circuit has "unequivocally held . . . that courts 'must consider the

[2]129 S. Ct. 1231 (2009). *Strickland* was a complicated case with an unusual procedural posture, but those intricacies ultimately do not affect this appeal.

[3]42 U.S.C. § 1973.

[4]*Thornburg v. Gingles*, 478 U.S. 30, 50 (1986).

*citizen* voting-age population of the group challenging the electoral practice . . . ."[5]

Plaintiffs here proposed single member residential districts. The Plaintiffs contend that one such district – in VRA parlance: the "proposed" or "demonstration" district – contains a sufficient number of Hispanics to satisfy the first *Gingles* test – 78% of the total population and 75% of the voting-age population. But, at trial, the parties disputed whether the Hispanic *citizen* voting-age population (HCVAP) exceeds the non-Hispanic *citizen* voting-age population. Without available data to reflect the actual number of Hispanic citizens of voting age living in the demonstration district, Plaintiffs tried in three indirect ways to prove that the HCVAP constituted a majority.

First, the Plaintiffs relied on an estimate made by the Texas Legislative Council (TLC) of the number of Spanish Surnamed Registered Voters (SSRVs) in the demonstration district. The TLC based its estimate on the number of SSRVs in Farmers Branch in 2006. According to the Plaintiffs, the TLC estimate shows that 52.5% of the of the registered voters in the demonstration district are Spanish surnamed.

Farmers Branch, however, presented rebuttal testimony from an expert, Dr. Rives, who faulted the TLC estimate for two reasons: 1) the TLC is inaccurate in small geographic areas like the demonstration district – something about which the TLC itself warns; and 2) the demonstration district split a voting precinct with an uneven distribution of SSRVs, which the TLC has no way to allocate. The district court credited Dr. Rives's testimony in concluding

---

[5]*Perez v. Pasadena Indep. Sch. Dist.*, 165 F.3d 368, 372 (5th Cir. 1999) (citing *Campos v. City of Houston*, 113 F.3d 544, 548 (5th Cir. 1997)).

that it is just as likely that Plaintiffs' proposed district does not have a majority HCVAP.

Second, the Plaintiffs undertook an "actual count" of the Hispanic citizens of voting age in the demonstration district. The Plaintiffs took the roll of registered voters in the demonstration district and – using the Census Bureau's list of Spanish surnames – counted the number of SSRVs on the roll. When this calculation showed that SSRVs accounted for only 46.5% of the registered voters in the demonstration district, Plaintiffs' expert Dr. Gambitta took a closer look. Dr. Gambitta claimed that the test did not record as Hispanic certain voters who were *in fact* Hispanic. Through a complex process – involving door-to-door personal inspection at residences with suspected Hispanic voters – Dr. Gambitta changed dozens of results from non-Hispanic to Hispanic. In this way, the Plaintiffs increased the number of registered Hispanic voters in the demonstration district to 50.7 percent. The district court, however, did not credit this calculation, because Dr. Gambitta had accounted only for "omission" errors – not "commission" errors. That is, Dr. Gambitta had adjusted for Hispanic voters not captured by the Spanish surname list; but he had failed to counter-adjust for non-Hispanic voters who had been erroneously counted by the Spanish surname list. This asymmetry of error correction doomed the evidence in the eyes of the district court.

Third, the Plaintiffs tried to show an HCVAP majority by arguing that Hispanics register to vote at a lower rate than non-Hispanics. Extrapolating data from the whole of Dallas County, Plaintiffs urged that for every 1.79 Farmers Branch Hispanic citizens of voting age, only one actually registered to vote. The corresponding non-Hispanic ratio was 1.279-to-one. By these ratios,

given the list of SSRVs in the demonstration district, the number of Hispanic citizens of voting age would constitute a majority. The district court did not credit this testimony, doubting its assumption that macro data from Dallas county could properly, or at least with persuasive force, be applied wholesale to the much smaller demonstration district. This doubt was supported by the testimony of a defense witness that the TLC showed that Hispanic citizens in the demonstration district actually registered at a much higher rate than one out of 1.79.

Concluding that the Plaintiffs had shown – at best – that it was *as likely as not* that the HCVAP constituted a majority in the demonstration district, the district court dismissed the voting rights claim. Plaintiffs had not proved the first *Gingles* test by a preponderance of the evidence.

## II.

### A. Citizenship and the Voting Rights Act

The Plaintiffs argue on appeal that the Supreme Court's decision in *Bartlett v. Strickland* held that only voting-age population matters under the first *Gingles* test – not *citizen* voting-age population; that the district court applied too stringent a test. We, of course, review de novo the legal standards that a district court applied in determining whether § 2 of the VRA has been violated.[6] Still, the Plaintiffs' claim has no merit.

Plaintiffs rely on passages from the plurality opinion in *Strickland*.

---

[6]*Perez*, 165 F.3d at 372.

Specifically, they argue that – with the following language – three members of the Supreme Court altered the first *Gingles* requirement: "[T]he majority-minority rule relies on an objective, numerical test: Do minorities make up more than 50 percent of the voting-age population in the relevant geographic area?"[7] To the Plaintiffs, the omission of the word "citizen" signals that citizenship is no longer strictly relevant. For four reasons we are not persuaded.

First, the question of citizenship was not before the Court in *Strickland*. Rather, the question was: If a minority population in a demonstration district comprises less than 50% of the possible voters, can it still meet the first *Gingles* test by showing that it can win elections with the help of a reliable crossover vote?[8] The question was *quantitative*, how many – not *qualitative*, what kind of people.

Second, language throughout Justice Kennedy's plurality opinion evidences the vitality of the citizenship requirement. Midway through the opinion, Justice Kennedy discusses whether a minority population "could constitute a compact voting majority."[9] A "voting majority" implies that the majority can actually vote, so the inquiry must take account of both citizenship and voting age. Then, at the end of his opinion, Kennedy restates his conclusion: "Only when a geographically compact group of minority *voters could form a majority* in a single-member district has the first *Gingles* requirement been

---

[7]*Strickland*, 129 S. Ct. at 1245 (plurality).

[8]*See id.* at 1241-46 (plurality).

[9]*Id.* at 1245 (plurality).

met."[10]  Because only voting-age citizens can be "voters" who "could form a majority," both of these traits bear on the test.  It is safe to assume that because citizenship was not at issue in the case, Justice Kennedy occasionally omitted the concept for the sake of concision.[11]

Third, the jurisprudential backdrop belies the notion that the Court would hold that citizenship is irrelevant under § 2 of the VRA.  Indeed, several sister Circuits have joined the Fifth in requiring voting rights plaintiffs to prove that the minority *citizen* voting-age population comprises a majority.[12]  It is most unlikely, especially in a case that does not have the citizenship issue, that the

---

[10]*Id.* at 1249 (plurality) (emphasis added).

[11]Cutting even deeper against the Plaintiffs' rationale, Justice Kennedy favorably cited to one of our cases that explicitly adopts the citizenship requirement under the first *Gingles* test.  *See id.* at 1246 (plurality) (citing *Valdespino v. Alamo Heights Indep. Sch. Dist.*, 168 F.3d 848, 852-53 (5th Cir. 1999) (mentioning that "this court has already determined what factors limit the relevant population in the district: voting-age and citizenship")).

[12]*Barnett v. City of Chicago*, 141 F.3d 699, 704 (7th Cir. 1998) ("We think that citizen voting-age population is the basis for determining equality of voting power that best comports with the policy of the statute."); *Negron v. City of Miami Beach*, 113 F.3d 1563, 1569 (11th Cir. 1997) ("[T]he proper statistic for deciding whether a minority group is sufficiently large and geographically compact is voting age population as refined by citizenship."); *Romero v. City of Pamona*, 883 F.2d 1418, 1426 (9th Cir. 1989) ("The district court was correct in holding that eligible minority voter population, rather than total minority population, is the appropriate measure of geographical compactness."), *overruled in part on other grounds by Townsend v. Holman Consulting Corp.*, 914 F.2d 1136, 1141 (9th Cir. 1990).

Court would silently overrule all of these Circuits' rules.[13]

Fourth, the Court issued no binding opinion in *Strickland*, only a judgment. Only Chief Justice Roberts and Justice Alito joined Justice Kennedy's plurality opinion. Justices Thomas and Scalia joined the judgment affirming that no voting rights violation existed, but flatly denied that *any* voter dilution claim could be made under § 2 of the VRA.[14] In short, even if the plurality had said in a voice that Plaintiffs would magnify that citizenship did not necessarily matter for the first *Gingles* test, three justices a rule do not make.[15]

---

[13]We note that the Plaintiffs suggest that the 10th and 11th Circuits have lately applied a different rule to the first *Gingles* test by not requiring an inquiry into citizenship, offering the following citations: *Sanchez v. State of Colorado*, 97 F.3d 1303, 1311 (10th Cir. 1996) (mentioning nothing about citizenship); *Solomon v. Liberty County, Florida*, 899 F.2d 1012, 1018 n.7 (11th Cir. 1990) (en banc) (reserving for another day the question whether black voters can make a claim under the VRA if they do not comprise more than 50% of the voting-age population); and *Thompson v. Glades County Board of County Commissioners*, 493 F.3d 1253, 1258 & 1265 (11th Cir. 2007) (holding that where black voters comprise a slim majority, the plaintiffs have met the first *Gingles* test). The Plaintiffs' citation to *Thompson* is curious, because the court there noted that "[t]here is a crucial distinction between a district with a majority of eligible minority voters and a district that is only majority minority because non-citizens are included in the count of the minority population. There is no dispute in this case that [the proposed district] constitutes the former, not the latter." *Thompson*, 493 F.3d at 1263 n.19.

[14]*Strickland*, 129 S. Ct. at 1250 (Thomas, J., concurring in the judgment).

[15]Additionally, the views of the six Justices not joining the plurality indicate that citizenship remains relevant. Justice Souter – joined by Justices Stevens, Ginsburg, and Breyer – suggested in dissent that citizenship counts. *C.f. id.* at 1250 (Souter, J., dissenting) ("In the plurality's view, only a district with a minority population making up 50% or more of the citizen voting age population (CVAP) can provide a remedy to minority voters . . . ."). And the

## B. The Claim

The Plaintiffs alternatively challenge that the district court erred by finding that they had not discharged their burden of proof on the first *Gingles* test. Per the Supreme Court: "The District Court's determination whether the § 2 requirements are satisfied must be upheld unless clearly erroneous."[16] Assisted by the district court's reasoned analysis, we quickly dispose of this factual review.

On appeal, the Plaintiffs press one main factual argument: It was illogical for the district court at one point to *discount* the weight of the Plaintiffs' TLC estimate and then at a different point to *rely* on the TLC to discredit Plaintiffs' assumed ratio of registered Hispanic voters to Hispanic citizens. Any dissonance did not escape the district court – which explained its rationale. In the first instance, the Plaintiffs tried to use the TLC estimate to prove – on its own – that the SSRVs in the demonstration district comprised a majority. The district court, while conceding that the TLC estimate was probative, did not think that the estimate – with its attendant unreliability – was enough to discharge the Plaintiffs' burden of proof.[17]

In the second instance, Farmers Branch offered a different calculation from the TLC study to rebut the Plaintiffs' assumption that Hispanic citizens in

---

Plaintiffs would find no solace in Justices Thomas or Scalia – who apparently would have dismissed the Plaintiffs' claim at the 12(b)(6) stage.

[16]*League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 427 (2006).

[17]R. at 545-46.

the demonstration district register to vote at the low rate of one out of 1.79. The district court could properly conclude that the use made of the data determined its probative value – here to question a statistical assumption.[18] And – even without this evidence – the bare assumption that registration rates from Dallas County could be applied wholesale to small neighborhoods would not have been enough to discharge the burden of proof. The assumption rests on a logical fallacy: Because the Hispanic *citizenship rate* in Farmers Branch is similar to the citizenship rate in Dallas County as a whole, the *voter registration rate* in the two areas must also be similar.[19] Farmers Branch is a small part of one of the largest metropolitan areas of the country. We know that issues local to a part of the county could well push registration at a local rate.

This court's rule requiring an inquiry into citizenship under the first *Gingles* test remains good law, and the district court did not otherwise clearly commit error.

AFFIRMED.

---

[18]R. at 558-61.

[19]*See* Appellants' Br. at 25. It should be noted that Plaintiffs' own expert even admitted that the assumption does not "necessarily" hold. Supp. R. at 198.